**David A. GITLITZ; Louise A. Gitlitz, Petitioners–Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

**and**

**Philip D. Winn; Eleanor G. Winn, Petitioners–Appellants,**

v.

**Commissioner of Internal Revenue, Respondent–Appellee.**

Nos. 98–9009, 98–9010.

United States Court of Appeals, Tenth Circuit.

July 6, 1999.

---

**1144**

Darrell D. Hallett (John M. Colvin with him on the brief), Chicoine & Hallett, P.S., Seattle, Washington, for the appellants.

Edward T. Perelmuter (Loretta C. Argrett, Assistant Attorney General, and Teresa E. McLaughlin with him on the brief), of the Tax Division, Department of Justice, Washington, D.C., for the appellee.

Before TACHA, MAGILL,* and BRISCOE, Circuit Judges.

BRISCOE, Circuit Judge.

The Commissioner of Internal Revenue assessed tax deficiencies against David and Louise Gitlitz and Philip and Eleanor Winn after determining the taxpayers improperly utilized excluded discharge of indebtedness income to adjust their subchapter S corporate bases. The United States Tax Court upheld the Commissioner's deficiency determinations and taxpayers now appeal. We exercise jurisdiction pursuant to 26 U.S.C. § 7482(a)(1) and affirm.

**I.**

David Gitlitz and Philip Winn each owned a fifty-percent interest in PDW & A, Inc., a Colorado corporation that elected to be taxed under subchapter S of the Internal Revenue Code. PDW & A was a partner in Parker Properties Joint Venture, a real estate partnership. In 1991, Parker Properties realized $4,154,891 in discharge of indebtedness income; PDW & A's pro rata share was $2,021,296. At that time, PDW & A was insolvent to the extent of $2,181,748 and thus was excluded from tax liability for the discharged debt income. *See* 26 U.S.C. §§ 108(a)(1)(B), 108(d)(6).[1]

Entering the 1991 tax year, both Gitlitz and Winn had suspended (i.e., unused) losses because each lacked sufficient basis

---

* Honorable Frank J. Magill, Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

1. With partnerships such as Parker Properties, the insolvency-based discharge of indebtedness income exclusion is assessed at the *partner* level. *See* 26 U.S.C. § 108(d)(6).

in PDW & A to deduct losses in prior years. *See* 26 U.S.C. § 1366(d)(1)(A) (the "aggregate amount of losses and deductions taken into account by a shareholder under [§ 1366(a)] for any taxable year shall not exceed ... the adjusted basis of the shareholder's stock in the S corporation"); 26 U.S.C. § 1366(d)(2) ("Any loss or deduction which is disallowed for any taxable year by reason of [§ 1366(d)(1)] shall be treated as incurred by the corporation in the succeeding taxable year with respect to that shareholder."). In 1991, Gitlitz and Winn each had additional losses from their association with PDW & A (i.e., pro rata shares of PDW & A's 1991 operating losses) which, when combined with their suspended losses, totaled $1,010,648.[2] Absent an increase in basis, Gitlitz and Winn would have had to treat these losses as suspended losses under § 1366(d)(1) because their bases in the corporation would have remained insufficient to permit contemporaneous recognition.

On their respective joint income tax returns for the relevant tax years, Gitlitz and Winn claimed increases in the bases of their PDW & A stock in the amount of their pro rata shares of the excluded discharge of indebtedness income.[3] Gitlitz and Winn maintained the excluded discharged debt was an "item of income (including tax exempt income)," as that term is used in § 1366(a)(1)(A), thereby facilitating their basis increases pursuant to 26 U.S.C. § 1367(a)(1)(A). With the basis adjustments, the validity of which is at issue here, Gitlitz and Winn were able to claim the full amount of their pro rata share of PDW & A's ordinary losses.

The Commissioner determined the taxpayers could not use PDW & A's excluded discharge of indebtedness income to increase their bases in the corporation stock and denied the taxpayers' ordinary loss deductions. The taxpayers contested the deficiency determinations. The Tax Court initially issued a consolidated opinion in favor of the taxpayers, but later granted the Commissioner's motion for reconsideration. The court relied on its "reviewed decision" in *Nelson v. Commissioner*, 110 T.C. 114, 1998 WL 66131 (1998), and upheld the Commissioner's deficiency determinations, determining discharge of indebtedness income, which is excluded from gross income under § 108(a), does not pass through to shareholders of subchapter S corporations. Thus, the court concluded a subchapter S corporation's shareholder may not use the corporation's untaxed discharge of indebtedness income to increase the shareholder's adjusted basis of corporate stock.

## II.

Decisions of the United States Tax Court are reviewed "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury." 26 U.S.C. § 7482(a)(1). We review factual findings for clear error and legal conclusions de novo. *Schelble v. Commissioner*, 130 F.3d 1388, 1391 (10th Cir.1997). Because the only issue here is whether the law applied to the undisputed facts satisfies the relevant statutory standard, we review the Tax Court's decision de novo as we are equally competent to draw conclusions from undisputed facts. *Id.* (citing *Anderson v. Commissioner*, 62 F.3d 1266, 1270 (10th Cir.1995)).

## III.

Before reaching the merits of taxpayers' arguments, we address their contention that the Commissioner waived in the Tax Court many of the arguments

---

**2.** Gitlitz had $538,423 in 1991 pro rata losses and $472,225 in suspended losses from previous tax years. Although the record does not reflect how Winn's losses were broken down, it appears he used a calculation similar to that used by Gitlitz.

**3.** Gitlitz reflected the adjusted basis on his 1991 return and Winn reflected the adjustment on his 1992 return. Winn did not employ a basis adjustment to facilitate an ordinary loss deduction on his 1991 joint tax return because he believed passive activity loss limitations prevented him from doing so.

now asserted on appeal. The Commissioner made clear in its motion for reconsideration that, notwithstanding certain ambiguous comments of counsel during the summary judgment hearing, it did not intend to waive any arguments previously asserted in its summary judgment motion. The Tax court apparently accepted the Commissioner's clarification in the order granting reconsideration. Such a decision is committed to the lower court's sound discretion, *see Elsken v. Network Multi–Family Sec. Corp.,* 49 F.3d 1470, 1476 (10th Cir.1995), and we discern no abuse here. Further, "it is well-settled that a court is not bound by stipulations of the parties as to questions of law." *Koch v. United States,* 47 F.3d 1015, 1018 (10th Cir.1995) (citations and internal alterations omitted). "[O]ur analysis, which may rest on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied on by the district court, is not constrained by the government's ill-considered concession." *United States v. Furman,* 112 F.3d 435, 438 n. 2 (10th Cir.1997) (citations omitted).

## Subchapter S Corporations

Subchapter S of the Internal Revenue Code, 26 U.S.C. §§ 1361–1379, permits certain corporations to elect to be taxed in a similar, but not identical, fashion as partnerships. *See* 3 Boris I. Bittker and Lawrence Lokken, *Federal Taxation of Income, Estates and Gifts* ¶ 95.6.1 (2d ed.1991) (highlighting major distinctions). A subchapter S corporation generally does not pay taxes as an entity. 26 U.S.C. § 1363(a). Instead, the corporation's profits and losses pass through directly to its shareholders on a pro rata basis and are then reported on the shareholders' individual tax returns. 26 U.S.C. § 1366(a). This conduit approach allows shareholders to avoid double taxation on corporate earnings. Tax integrity, meanwhile, is preserved by requiring shareholders to treat all income and deductions as if "realized directly from the source from which realized by the corporation, or incurred in the same manner as incurred by the corpora-

tion." 26 U.S.C. § 1366(b). In other words, "the items attain no greater dignity from being passed through the corporation." Boris I. Bittker and James S. Eustice, *Federal Income Taxation of Corporations and Shareholders,* ¶ 6.06[2][c] (6th ed.1998).

To further prevent double taxation of subchapter S corporate income upon distribution to shareholders, § 1367(a) normally requires shareholders to adjust their corporate bases by the items identified in § 1366(a). In particular, basis must be increased by, *inter alia,* the items of income delineated in § 1366(a)(1)(A). Basis must be decreased by, *inter alia,* the items of loss and deduction set forth in § 1366(a)(1)(A), as well as corporate distributions previously excluded from shareholders' income pursuant to 26 U.S.C. § 1368(b). Section 1368(b) provides that distributions of a subchapter S corporation having no earnings and profits (as is the case with PDW & A) are treated as follows:

(1) *Amount applied against basis.*— The distribution shall not be included in gross income to the extent that it does not exceed the adjusted basis of the stock.

(2) *Amount in excess of basis.*—If the amount of the distribution exceeds the adjusted basis of the stock, such excess shall be treated as gain from the sale or exchange of property.

Two examples help explain how this statutory scheme operates. Assume the sole shareholder of a subchapter S corporation has a basis of $100 in the corporation's stock. The corporation realizes $200 in taxable income. At the end of the tax year, the shareholder pays tax on the $200 of income under the "pass through" principles described above. The corporation distributes the $200 to the shareholder the following year. In the absence of an upward basis adjustment, the shareholder would be liable for additional tax upon the distribution pursuant to § 1368(b)(2) because the amount of the distribution ($200)

exceeds his preexisting basis in the stock. Sections 1366 and 1367 prevent this double taxation by mandating a $200 basis increase when the corporation first realizes the income and a $200 basis decrease upon the corporation's distribution of the income.

A second example illustrates how the character of tax-exempt income is preserved under the subchapter S framework. Assume the same subchapter S corporation realizes $200 in tax-exempt income. Although a "pass through" technically occurs, the shareholder pays no tax on the income because, under § 1366(b), the income after "pass through" has the same character as if it was realized by the corporation. The corporation distributes the income to its shareholder the next year. Without the requisite basis adjustment, the shareholder would be forced to pay tax on the distribution under § 1368(b)(2) because the amount of the distribution exceeds his preexisting basis in the stock. Once again, §§ 1366 and 1367 prevent such a result by dictating a $200 basis increase when the corporation first realizes the income and a $200 basis decrease upon the corporation's distribution of the income. As a result, the shareholder pays no taxes on the income.

### Discharge of Indebtedness Income and Insolvency Exception

Section 61(a)(12) of the Internal Revenue Code, 26 U.S.C. § 61(a)(12), ordinarily requires a taxpayer who has incurred a financial obligation, which is later discharged in whole or in part, to recognize as taxable income the extent of the reduction in the obligation. Section 108(a)(1) provides an exception to this rule if, *inter alia*, the debt is discharged in a bankruptcy proceeding or at a time when the taxpayer is insolvent. Exclusion of discharge of indebtedness from gross income, however, does not come without a price. Specifically, a taxpayer omitting such discharged debt from his income must make correla-

tive reductions in various "tax attributes" that could otherwise yield future tax benefits. *See* 26 U.S.C. § 108(b). After the requisite tax attribute reductions have been made, any "remaining debt discharge amount is disregarded, i.e., does not result in income or have other tax consequences." S. Rep. No. 96–1035, at 2 (1980), *reprinted in* 1980 U.S.C.C.A.N. 7017, 7018. This statutory scheme has "the effect of relieving the taxpayer of immediate recognition of debt discharge income, but at the cost of a forfeiture of an equal amount of potential tax benefit." 1 Boris I. Bittker and Lawrence Lokken, *Federal Taxation of Income, Estates and Gifts* ¶ 7.6.3, at 7–58 (3d ed.1999).[4]

■ In this case of first impression, taxpayers maintain PDW & A's canceled debt is an "item of income (including tax exempt income)" under § 1366(a)(1)(A). As the taxpayers see it, PDW & A's debt discharge, because it is an item of income under § 1366(a)(1)(A), passes through to them immediately by way of § 1366 and allows them to increase their basis in the corporation pursuant to § 1367(a)(1)(A). If we embrace taxpayers' position, subchapter S corporate shareholders would receive a windfall. Not only would shareholders avoid taxation on the corporation's discharged debt, they would also receive an upward basis adjustment, thereby permitting them to report a larger capital loss from the sale of their stock. In addition, shareholders would be able to use the corporation's net operating losses to reduce their own non-corporate related gross income without having to decrease the net operating losses by the amount of the corporation's discharged debt. Taxpayers acknowledge the windfall, but insist the statutory language dictates such a result.

The Supreme Court has held the Internal Revenue Code "should not be interpreted to allow [taxpayers] the practical equivalent of [a] double deduction absent a clear declaration of intent by Congress." *United States v. Skelly Oil Co.*, 394 U.S.

4. If a taxpayer's attributes are insufficient to absorb all of his cancellation of indebtedness

income, § 108 effectively provides a permanent exemption from taxation on that income.

678, 684, 89 S.Ct. 1379, 22 L.Ed.2d 642 (1969) (citations omitted). We believe this principle is equally applicable to windfalls. Accordingly, only if taxpayers' theory is unequivocally supported by the statutory text may we adopt it here. Although taxpayers make some compelling arguments, we do not believe Congress intended to confer such a windfall upon individuals in their position.

### Exclusion of Discharge of Indebtedness Income at Corporate Level

With subchapter S corporations, § 108's discharge of indebtedness income exclusions *and* tax attribute reduction principles must be applied at the *corporate* level. 26 U.S.C. § 108(d)(7)(A). The Commissioner argues, and the Tax Court held, this rule serves as an exception to the normal pass-through practice in which items of income percolate directly to a corporation's shareholders. Taxpayers claim, however, that the only purpose of § 108(d)(7)(A) is to create uniformity in the tax treatment of subchapter S corporations by applying the insolvency test at the corporate rather than shareholder level. If the corporation is solvent, the debt discharge is taxable; if the corporation is insolvent, the canceled debt is excluded from gross income up to the amount of the corporation's insolvency. Under either scenario, the taxpayers insist, the pass-through principles of subchapter S are fully applicable and shareholders must adjust their bases in the corporation. Although taxpayers' argument is not without merit, we reject it in favor of a position closer, although not identical, to that of the Commissioner.

We note preliminarily that the parties have devoted significant discussion to the legislative history of the Subchapter S Revision Act of 1982, Pub.L. No. 97–354, 96 Stat. 1669, which adopted 26 U.S.C. §§ 1366–1368, and the Tax Reform Act of 1984, Pub.L. No. 98–369, 98 Stat. 494, which amended 26 U.S.C. § 1366. We find this legislative history largely unhelpful. The Commissioner's protestations notwithstanding, we discern no intent by Congress to treat certain subchapter S corporation income at the corporate level while treating other income at the shareholder level. Such a scheme would fundamentally alter the manner in which subchapter S corporations are taxed. Section 1366(a)(1) makes clear that *all* items of income are attributed initially to the corporation. Because the subchapter S corporation is not a tax-paying entity, however, the items must pass through to shareholders unless they are absorbed by tax attribute reductions.

The outcome of this case is ultimately determined by the timing of the pass-through. If the attribute reduction procedures *precede* the pass-through, the corporation's excluded discharge of indebtedness income is absorbed before it can pass through to shareholders and compel basis adjustments. Potential windfalls are thus avoided. If, on the other hand, attribute reduction takes place *after* the pass-through, the taxpayers' theory must prevail. For the reasons described below, we conclude attribute reduction must precede the pass-through.

### Shareholder Suspended Losses as Corporate Net Operating Losses

Section 108(d)(7)(B) provides that, in administering the tax attribute reduction scheme, shareholder losses suspended pursuant to § 1366(d)(1) must be treated as net operating losses for purposes of § 108(b)(2)(A), thereby precluding subchapter S corporation shareholders with carryover losses from enjoying the tax benefits of ordinary losses while simultaneously avoiding taxation on discharge of indebtedness income. As we interpret this statute, these suspended losses are added to the corporation's annual net operating losses in applying the net operating loss tax attribute reduction.

Taxpayers maintain subchapter S corporations, by their very nature, have no net operating losses, and suggest the net operating loss tax attribute is confined to shareholder suspended losses. We have found no case law squarely addressing this issue. It is true that, because a subchapter S corporation's losses are normally de-

ductible only by its shareholders and only to the extent of their bases in the corporation, *see* § 1366(d)(1), the corporation itself is not permitted to take a net operating loss deduction. However, nothing in the Internal Revenue Code mandates that corporate net operating losses pass through *immediately* to shareholders. If pass through was immediate, shareholders could secure a windfall by (1) avoiding tax on corporate discharge of indebtedness income under § 108(a), and (2) employing the corporation's passed-through net operating losses to reduce their own non-corporate related gross income without having first decreased the net operating losses by the amount of the corporation's discharged debt. The inequity would be magnified further if the shareholder's pre-pass-through basis was insufficient to recognize the net operating losses, and recognition was only possible as a result of the discharged debt increasing the shareholder's basis. Moreover, regardless of the pre-pass-through basis, the increase in basis resulting from an immediate pass-through of nontaxable discharge of indebtedness income would permit shareholders to secure a higher capital loss upon the ultimate disposition of the corporation.

■ To embrace the taxpayers' position is to effectively eliminate the "price" Congress imposed upon entities whose discharged debt income is excluded under § 108. We conclude when § 108(a)'s discharge of indebtedness income exclusion is triggered, a shareholder's pro rata share of the corporation's net operating losses passes through to him only to the extent such losses are not absorbed by the shareholder's pro rata share of the excluded canceled debt.[5]

### 26 U.S.C. § 108(b)(4)(A)

The most difficult aspect of this case is determining the role § 108(b)(4)(A) plays in the tax calculation. This section states the attribute reductions outlined in § 108(b)(2) "shall be made after the determination of the tax imposed ... for the taxable year of the discharge." Taxpayers suggest an insolvent subchapter S corporation's discharge of indebtedness may be used in the current tax year to increase shareholder basis because the requisite tax attribute reduction does not occur until the following year. In essence, they claim the corporation's excluded discharge of indebtedness income passes through to them immediately upon recognition by the corporation.

Unfortunately, there is no case law and commentators are divided on the proper operational mechanics of § 108(b)(4)(A). *Compare* C. Richard McQueen and Jack F. Williams, *Tax Aspects of Bankruptcy Law and Practice* § 25:6, at 25–6 (3d ed.1997) (tax attribute reductions made in year of discharge) *with* 15 *Collier on Bankruptcy* ¶ 6.03[4][b][i], at 6–103 (Lawrence P. King ed., 15th ed.1999) (tax attribute reductions made in year following discharge). The only point upon which all agree is that § 108(b)(4)(A) is not an example of legislative clarity. Although a close question, we ultimately conclude the taxpayers' theory is not compelling. According to § 108(d)(7)(A), tax attributes reductions must be applied at the corporate level with subchapter S corporations. Taxpayers' proposal would not give effect to the attribute reduction scheme. Taxpayers' approach, in fact, would thwart the purpose of the net operating loss tax attribute:

> By reason of the debt discharge, losses sustained by the taxpayer have been borne by the taxpayer's creditors. Normally, this would be reflected by requiring that the taxpayer recognize gross income in the year of the discharge to

---

5. Although not applicable to this case, the Internal Revenue Service recently proposed regulations providing that excluded discharge of indebtedness income may never be treated as tax-exempt income under § 1366(a)(1)(A), and is thus not susceptible to a pass-through,

because the excluded income is generally only deferred, and not permanently exempted. *See* 63 Fed.Reg. 44181, 44182–44183 (1998) (discussing rationale for proposed Treas. Reg. § 1.1366–1(a)(2)(viii)). We do not address the validity of this proposed regulation.

offset its earlier deductions of the shifted losses. However, because the losses have not yet yielded tax benefit, this rule simply shaves down the loss deductions to eliminate the portions not ultimately borne by the taxpayer.

1 Bittker and Lokken, *supra* ¶ 7.6.3, at 7–59.

As we see it, § 108(b)(4)(A) is simply designed to compute certain· tax applications (e.g., establishing income ceilings for § 108(b)(2) deductions/credits, assessing charitable contribution deduction limitations, evaluating application of possible alternative minimum tax, etc.) before reducing tax attributes. We do not read the statute as mandating that attribute reductions be made *in the tax year following the year of the discharge.* We concede that, if

§ 108(b)(4)(A) is read narrowly and in isolation, it is plausible to conclude Congress intended tax attributes to be reduced only in the tax year following the taxable year of the discharge. But we must read the Internal Revenue Code as a whole. *UNUM Corp. v. United States,* 130 F.3d 501, 507 (1st Cir.1997). "[T]he expounding of a statutory provision strictly according to the letter without regard to other parts of the Act and legislative history [may] often defeat the object intended to be accomplished." *Id.* (quoting *Helvering v. New York Trust Co.,* 292 U.S. 455, 464, 54 S.Ct. 806, 78 L.Ed. 1361 (1934)). Taxpayers' interpretation of § 108(b)(4)(A) would negate the effect of the tax attribution scheme and would give taxpayers an unwarranted windfall.[6]

---

**6.** The following examples underscore how our interpretation of the interplay between §§ 108 and 1366–1368 operates in practice. In each example, X is the sole shareholder of an insolvent subchapter S corporation.

Example 1: In 1991, the corporation realizes $500 of discharge of indebtedness income and has $100 of net operating losses. The corporation has no other tax attributes and X has no suspended losses. In calculating its 1991 tax return, the corporation first computes its discharged debt income and sets this figure aside temporarily (i.e., it does not pass through immediately to X). The corporation then calculates its net operating losses for the year. Finally, the corporation applies the excluded discharged debt to reduce its tax attributes in accordance with §§ 108(b)(2) and 108(d)(7)(B). After reducing the $500 in discharged debt by the $100 in net operating losses, $400 of canceled debt remains. Because any remaining debt discharge amount is disregarded following the required reduction of tax attributes, this $400 is ignored and has no tax consequences. Thus, there are no items of income to pass through to X. X cannot utilize any net operating losses incurred by the corporation to offset his own gross income nor can he adjust his corporate basis.

Example 2: Same facts as example 1, but now the corporation realizes $100 of discharge of indebtedness income and $500 of net operating losses. In calculating its 1991 tax return under the method described above, after reducing the $100 in discharged debt, dollar for dollar, by the net operating losses, $400 of net operating losses remains. The $400 of net operating losses flows through to X and, assuming he has a sufficient basis in the corporation, may be used by him to offset his own gross income.

Example 3: In 1991, the corporation realizes $500 of discharge of indebtedness income and has $100 of net operating losses. The corporation has no other tax attributes. X has $200 in suspended losses. In calculating its 1991 tax return, the corporation first computes its discharged debt income and sets this figure aside temporarily. The corporation then calculates its net operating loss tax attribute ($100 + $200 = $300). Finally, the corporation applies the excluded discharged debt to reduce its tax attributes. After reducing the $500 in discharged debt by the $300 net operating loss tax attribute, $200 of canceled debt remains. Because any remaining debt discharge amount is disregarded following the required tax attribute reductions, this $200 is ignored and has no tax consequences. As a result, there are no items of income to pass through to X. X cannot utilize any net operating losses incurred by the corporation to offset his own gross income nor may he adjust his corporate basis. X has also permanently lost the use of $200 in suspended losses.

Example 4: Same facts as example 3, but now the corporation realizes $100 of discharge of indebtedness income and has $500 of net operating losses. In calculating its 1991 tax return, the corporation first computes its discharged debt income and sets this figure aside temporarily. The corporation then calculates its net operating loss tax attribute ($500 + $200 = $700). Finally, the corporation applies the excluded discharged debt to reduce its tax attributes. After reducing the $100 in discharged debt, dollar for

In 1991, PDW & A realized $2,021,296 in cancellation of indebtedness income. PDW & A was insolvent to the full extent of this figure and thus was excluded from paying taxes on the canceled debt. Shareholders Gitlitz and Winn each had a $1,010,648 pro rata share of discharged debt. Additionally, Gitlitz and Winn each had a combination of pro rata 1991 net operating losses and suspended losses from prior years which totaled $1,010,648. *See* footnote 2. In calculating its 1991 taxes, PDW & A first must compute its discharge of indebtedness income and set this figure aside temporarily. The corporation then must calculate its net operating loss tax attribute ($1,010,648 for Gitlitz + $1,010,648 for Winn = $2,021,296). Finally, the corporation must apply the excluded discharged debt to reduce its tax attributes. In this case, the net operating loss tax attribute fully absorbs the corporation's excluded discharge of indebtedness income. Thus, there are no items of income to pass through to Gitlitz and Winn. The shareholders cannot utilize any net operating losses incurred by PDW & A to offset their own gross income or to adjust their corporate basis. Further, the suspended losses of Gitlitz and Winn effectively disappear and have no future tax consequences.

## Holding Confined to Excluded Discharge of Indebtedness Income

We emphasize this case focuses only on excluded discharge of indebtedness income vis-a-vis insolvent subchapter S corporations. The special exception for treating such excluded income at the corporate level in § 108(d)(7)(A) and the tax attribute reduction scheme in § 108(b) have no application to other forms of tax-exempt income.[7] The distinction is particularly logi-cal when one considers that subchapter S corporation shareholders generally are not entitled to include the corporation's indebtedness to third parties in calculating their basis. *Uri v. Commissioner*, 949 F.2d 371, 373 (10th Cir.1991). The theory behind this rule is that the shareholders themselves have made no economic outlay. *See Goatcher v. United States*, 944 F.2d 747, 751 (10th Cir.1991) (citing *Estate of Leavitt v. Commissioner*, 875 F.2d 420, 422 (4th Cir.1989)). The types of tax-exempt income the taxpayers reference (i.e., non-taxable life insurance proceeds and municipal bond income) are acquired through initial economic outlays.

### CSI Hydrostatic Testers

Taxpayers suggest the holding in *CSI Hydrostatic Testers, Inc. v. Commissioner*, 103 T.C. 398, 1994 WL 466342 (1994), *aff'd*, 62 F.3d 136 (5th Cir.1995) (per curiam) is inconsistent with the holding here. *CSI* is unrelated to the present case. The issue in *CSI* was whether discharge of indebtedness income, which was excluded from the taxable income of a subsidiary *subchapter C* corporation pursuant to § 108(a), had to be included in the subsidiary's earnings and profits. The case turned on interpretations of 26 U.S.C. § 312(*l*) and 26 C.F.R. § 1.1502–19 (1987). Subchapter S corporations were not at issue. Nor was the potential windfall question before us even considered. In sum, taxpayers' reliance on *CSI* is inapposite. Taxpayers' remaining arguments have been rendered moot by the preceding discussion.

The decision of the Tax Court is AFFIRMED. Taxpayers' motion to supplement the record with a letter which was

---

dollar, by the net operating losses, $400 of 1991 net operating losses remains in addition to X's $200 of suspended losses. The $600 combined amount flows through to X and, depending on his basis, may be used by him (in whole or in part) to offset his own gross income.

7. We assume here that excluded discharge of indebtedness income is tax-exempt income. As noted earlier, Internal Revenue has proposed regulations that would foreclose such a classification.

not a part of the record before the Tax Court is DENIED.

**Mel T. NELSON, Petitioner–Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

No. 98–9014.

United States Court of Appeals, Tenth Circuit.

July 6, 1999.

John M. Colvin of Chicoine & Hallett, P.S., Seattle, Washington, (Neil M. Goff, of Otten, Johnson, Robinson, Neff & Ragonetti, P.C., Denver, Colorado, on the brief), for the appellant.

Edward T. Perelmuter (Loretta C. Argrett, Assistant Attorney General, and Teresa E. McLaughlin with him on the brief), of the Tax Division, Department of Justice, Washington, D.C., for the appellee.

Before TACHA, MAGILL,* and BRISCOE, Circuit Judges.

BRISCOE, Circuit Judge.

The Commissioner of Internal Revenue assessed a tax deficiency against Mel T. Nelson after determining Nelson had improperly utilized excluded discharge of indebtedness income to adjust his subchapter S corporate basis. The United States Tax Court upheld the Commissioner's deficiency determination and Nelson appeals. We exercise jurisdiction pursuant to 26 U.S.C. § 7482(a)(1) and affirm.

Nelson was the sole shareholder of Metro Auto, Inc., a subchapter S corporation. In 1991, Metro Auto had $654,788 in net operating losses. The corporation also realized $2,030,568 in discharge of indebtedness income from disposition of all its assets and a related agreement with creditors. Metro Auto was insolvent both before and after the events giving rise to the discharge of indebtedness income. The corporation excluded the full amount of the canceled indebtedness from gross income on its 1991 federal tax return.

Nelson treated Metro Auto's discharge of indebtedness income as if the "pass-through" principles and basis adjustment provisions normally applicable to subchapter S corporate shareholders were in play. He thus increased his basis in his Metro Auto stock by $1,375,790—the amount the discharge of indebtedness income exceeded net operating losses. Nelson disposed of his stock shortly thereafter and claimed a $2,403,996 long-term capital loss on his 1991 individual federal tax return. The Commissioner determined Nelson could not use the corporation's excluded discharge of indebtedness income to increase the basis in his stock and denied $1,375,790 of Nelson's purported long-term capital loss.

Nelson contested the deficiency determination in Tax Court. In a "reviewed decision," the Tax Court held, without dissent, that discharge of indebtedness income of an insolvent subchapter S corporation, which is excluded from gross income under Internal Revenue Code § 108(a), 26 U.S.C. § 108(a), does not pass through to the shareholders of the subchapter S corporation. *See Nelson v. Commissioner*, 110 T.C. 114, 1998 WL 66131 (1998). The court thus concluded a shareholder of an insolvent subchapter S corporation may not increase the adjusted basis of his stock based on the corporation's untaxed discharge of indebtedness income.

For the same reasons outlined in our published opinion filed today in *Gitlitz v.*

---

* Honorable Frank J. Magill, Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

*Commissioner,* Nos. 98–9009 and 98–9010, we AFFIRM the decision of the Tax Court.

**Terry Lynn RHINE, Petitioner–
Appellant,**

v.

**Bobby BOONE, Respondent–Appellee.**

**No. 98–6353.**

United States Court of Appeals,
Tenth Circuit.

July 7, 1999.

Terry Lynn Rhine, pro se.

Before PORFILIO, McKAY, and LUCERO, Circuit Judges.

McKAY, Circuit Judge.

This appeal arises from the district court's dismissal of petitioner's habeas corpus petition as time-barred.[1] Petitioner was convicted of second degree murder in state court after his plea of *nolo contendre.* He moved to withdraw his plea, and the trial court denied the motion. Because we do not have the state court record before us, it is difficult to ascertain the exact series of events that followed. We have,

---

1. After examining the appellant's pro se brief and the appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R.App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

however, pieced the following event time-line from the briefs and the few state court documents that are in the record.

Petitioner's brief in support of his habeas petition states that he filed a pro se state court application for post-conviction relief on March 2, 1994. R. Vol. I, tab 2 at 2. The post-conviction application was denied on April 21, 1994, and he appealed the denial to the Oklahoma Court of Criminal Appeals on June 6, 1994. *See id.* On appeal, the Oklahoma Court of Criminal Appeals ordered the trial court to hold a new hearing on petitioner's motion to withdraw his plea. After a new hearing, the state court again denied the motion to withdraw the plea, and petitioner filed a second application for state post-conviction relief "[i]n June 1996."[2] *Id.* at 3. The state district court denied the second application, and the Oklahoma Court of Criminal Appeals affirmed the trial court's denial of post-conviction relief on February 24, 1997. Petitioner filed a petition for writ of certiorari with the United States Supreme Court on April 11, 1997, and the petition was denied on June 16, 1997. Petitioner filed his petition for writ of habeas corpus relief pursuant to 28 U.S.C. § 2254 with the federal district court on February 23, 1998. The district court dismissed the petition as untimely and granted a certificate of appealability on the tolling issue.

According to 28 U.S.C. § 2244(d)(1)(A), a person in custody pursuant to the judgment of a state court has one year from the date the judgment became final to file an application for writ of habeas corpus pursuant to § 2254. This one-year limitation period was added to the statute by the Antiterrorism and Effective Death Penalty Act (AEDPA), which took effect on April 24, 1996. Petitioners whose convictions became final before the effective date of

the AEDPA were given a grace period to file their federal habeas petitions by April 23, 1997. *See United States v. Simmonds,* 111 F.3d 737, 746 (10th Cir.1997). Pursuant to 28 U.S.C. § 2244(d)(2), the time during which a petitioner has a properly filed application for state post-conviction review pending is not counted toward the limitation period. *See Hoggro v. Boone,* 150 F.3d 1223, 1226 (10th Cir.1998).

The majority of petitioner's pro se brief on appeal centers around his contention that the State denied him access to legal materials, creating an impediment to timely filing his habeas petition. He argues that because of the State-created impediment, his limitation period should begin to run from the time the impediment was removed. *See* 28 U.S.C. § 2244(d)(1)(B). Petitioner did not make this argument to the district court. He filed an objection to the State's motion to dismiss the habeas petition as untimely, but he did not argue that the State had created an impediment to his filing in violation of the Constitution. Because we will generally not consider issues raised on appeal that were not first presented to the district court, *see Walker v. Mather (In re Walker),* 959 F.2d 894, 896 (10th Cir.1992), we do not address this issue.

Conversely, petitioner argued to the district court that the limitation period should be equitably tolled, but he has waived that issue by not raising it before this court. *See State Farm Fire & Cas. Co. v. Mhoon,* 31 F.3d 979, 984 n. 7 (10th Cir.1994). We note, however, that the district court found that the circumstances of this case do not warrant equitable tolling, and, were we to decide this issue, we would agree.

---

2. The application is not in the record, but the district court considered that the application was filed on June 1, 1996. *See* R. Vol. I, tab 17 at 2. The State, in its brief in support of its motion to dismiss for lack of jurisdiction, sets the exact filing date at June 17, 1996. *See id.,* tab 11 at 2. We will adhere to the district court's assumption of June 1, 1996, as the filing date of the second post-conviction application, but we note that the result of this appeal would be the same using either date. In addition, we recognize that the State identifies this as petitioner's third habeas petition, but petitioner maintains it was his second application. This point is also not relevant to our decision.

The issue that we address on appeal is how much time of the one-year limitation period was tolled under § 2244(d)(2). It is undisputed that the time during which petitioner's second state application for post-conviction relief was pending should not be counted toward the limitation period. It is also undisputed that this includes the 269 days between June 1, 1996 (the date the district court assumed the petition was filed) and February 24, 1997 (the date on which the Oklahoma Court of Criminal Appeals affirmed the denial of post-conviction relief). Adding those 269 days onto the end of the grace period would result in a filing deadline of January 20, 1998.[3] Under this calculation, the habeas petition before this court, which was filed on February 23, 1998, was untimely. The point that is disputed is whether the 112 days from the final state court action on the state post-conviction application (February 24, 1997) until the petition for certiorari was denied by the United States Supreme Court (June 16, 1997) should be counted toward the limitation period, or whether that time also tolled the limitation period under § 2244(d)(2). If that time tolled the limitation period, just as the 269 days the post-conviction petition was pending in state court did, the filing deadline would have been May 11, 1998,[4] and the habeas petition would have been timely.

We hold that the limitation period was tolled only while petitioner was seeking state court review of his post-conviction application. *See Barnett v. Lemaster,* 167 F.3d 1321, 1323 (10th Cir.1999) (holding that the term "pending" in § 2244(d)(2) must be construed "to encompass all of the time during which a state prisoner is attempting, *through proper use of state court procedures,* to exhaust *state court remedies* with regard to a particular post-conviction application." (emphasis added)). The time after the Oklahoma Court of Criminal Appeals finally denied his post-conviction application until the United States Supreme Court denied his petition for certiorari was not "time during which a properly filed application for State post-conviction ... review ... [was] pending," and, therefore, it should be counted toward the one-year limitation period. 28 U.S.C. § 2244(d)(2). We have previously so held in an unpublished order and judgment. *See Maloney v. Poppel,* No. 98–6402, 1999 WL 157428, at *1 (10th Cir. Mar.23, 1999) (unpublished) (citing *Barnett* in holding that tolling did not continue to include time during which the petitioner could have petitioned the United States Supreme Court for certiorari).

The tolling provision in § 2244(d)(2) is distinguishable from § 2244(d)(1)(A), which does take into account the time during which a petition for certiorari to the United States Supreme Court can be filed. Section 2244(d)(1) provides alternative dates from which the one-year limitation period begins to run. Subsection (A) provides that the one-year limitation period runs from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." Courts have held that, for purposes of this subsection and a similar section in § 2255, the judgment is not final and the one-year limitation period for filing for federal post-conviction relief does not begin to run until after the United States Supreme Court has denied review, or, if no petition for certiorari is filed, after the time for filing a petition for certiorari with the Supreme Court has passed. *See, e.g., James v. Scott,* No. 99–7005, slip op. at 2, 1999 WL 285956 (10th Cir. May 20, 1999) (unpublished) (§ 2254, citing *Griffith v. Kentucky,* 479 U.S. 314, 321 n. 6, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987)); *Harris v. Champion,* No. 98–6318, 1999 WL 84476, at *1 (10th

---

3. The filing deadline was January 17, 1998, which was a Saturday. The following Monday was a legal holiday, so the petition should have been filed by Tuesday January 20, 1998. *See* Fed.R.Civ.P. 6(a).

4. The filing deadline would have fallen on Saturday May 9, 1998, so petitioner would have had until Monday May 11, 1998 to file his petition. *See* Fed.R.Civ.P. 6(a).

Cir. Feb.22, 1999) (unpublished) (same); *United States v. Lacey,* No. 98–3030, 1998 WL 777067, at *1 (10th Cir. Oct.27, 1998) (unpublished) (§ 2255); *Nichols v. Bowersox,* 172 F.3d 1068, 1072 (8th Cir.1999) (§ 2254); *Kapral v. United States,* 166 F.3d 565, 570–71 (3d Cir.1999) (§ 2255). It would not be in the interest of judicial efficiency to require a prisoner to begin post-conviction proceedings before his judgment of conviction was final, and that is why the relevant statutes hinge the running of the limitation period on the finality of the judgment of conviction, *see* 28 U.S.C. §§ 2244(d)(1)(A), 2255(1).

The same rationale does not extend, however, to the tolling provision of § 2244(d)(2). The state post-conviction proceeding is final after the state's highest court has addressed the application. Exhaustion of state remedies, which is a precondition to the ability to petition for a writ of habeas corpus, does not include a direct appeal to the United States Supreme Court from the state's denial of post-conviction relief, and neither is a federal court's jurisdiction to entertain a habeas petition affected by whether or not review of the state's denial of post-conviction relief is sought in the Supreme Court. *See Fay v. Noia,* 372 U.S. 391, 435–38, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), *overruled in part on other grounds by Coleman v. Thompson,* 501 U.S. 722, 744–51, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *County Court of Ulster County, N.Y. v. Allen,* 442 U.S. 140, 149 n. 7, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979). The tolling provision specifically refers to a properly filed application for "State post-conviction or other collateral review." 28 U.S.C. § 2244(d)(2). We are satisfied that, in the wording of § 2244(d)(2), "State" modifies the phrase "post-conviction review" and the phrase "other collateral review." A petition for writ of certiorari to the United States Supreme Court is simply not an application for state review of any kind; it is neither an application for state post-conviction review nor an application for other state collateral review.

Because we hold that § 2244(d)(2) does not direct that the statute of limitations was tolled during the time the petition for writ of certiorari was before the United States Supreme Court, the petition for writ of habeas corpus in this case was time-barred. The district court was correct in dismissing the habeas petition as untimely, and we DISMISS the appeal.

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Alfredo TORRES, Defendant–Appellant.**

**No. 98–3006.**

United States Court of Appeals,
Tenth Circuit.

July 7, 1999.

Cenobio Lozano, Jr., Harrisonville, Missouri, for Defendant–Appellant.

Jackie N. Williams, United States Attorney for the District of Kansas, and Leon

Patton, Assistant U.S. Attorney, Kansas City, Kansas, for Plaintiff–Appellee.

Before BRORBY, McKAY, and EBEL, Circuit Judges.

McKAY, Circuit Judge.

Appellant–Defendant, Alfredo Torres, challenges his sentence on conviction of conspiracy to distribute marijuana and cocaine in violation of 21 U.S.C. §§ 846 and 841(a)(1). Mr. Torres contends that the district court misapplied certain provisions of the United States Sentencing Guidelines to improperly include three prior sentences in determining his criminal history category. We exercise jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

Mr. Torres, along with eleven other co-conspirators, operated a drug importation and distribution enterprise in the greater Kansas City area from 1994 until June 1996. The government indicted Mr. Torres for multiple drug-related offenses. He subsequently pleaded guilty to the charge of conspiracy to distribute marijuana and cocaine in violation of 21 U.S.C. § 846. The presentence report established Mr. Torres' base offense level for the conspiracy conviction at 32. In addition, the report recommended a four-level increase under United States Sentencing Guidelines § 3B.1.1(a) because of Mr. Torres' role as leader or organizer of a criminal activity involving five or more participants but allowed a three-level decrease for acceptance of responsibility under § 3E1.1(b). These adjustments resulted in a final recommended total offense level of 33.

The presentence report also recommended the assessment of nine criminal history points against Mr. Torres, placing him in criminal history category IV. The report calculated Mr. Torres' criminal history points as follows: (1) one point for a thirty-day sentence imposed in 1992 for violating the terms of probation imposed in a 1985 juvenile conviction for driving while intoxicated; (2) two points for a ninety-day sentence imposed in 1986 for driving while intoxicated; (3) two points for a 132–day sentence for misdemeanor possession of marijuana in 1994; (4) one point for a two-year probationary sentence for felony possession of marijuana in 1995; (5) two points for committing the present offense while on supervised release and probation for other crimes; and (6) one point for committing the present offense less than two years after release from another term of imprisonment. Adopting the recommended total offense level of 33 and a criminal history category of IV, the district court sentenced Mr. Torres to 188 months in prison with a five-year term of supervised release-the minimum allowable sentence within the guideline range. *See* U.S.S.G. Ch. 5, Pt. A.

Mr. Torres does not contest his conviction or the calculation of his total offense level. Instead, he raises two issues challenging the district court's criminal history assessment. First, Mr. Torres cites guideline provisions explicitly disallowing the double-counting that results from assessing criminal history points for prior sentences which are part of the present offense or that were already considered in setting the base offense level. Based on these rules, he contends that the court should not have considered his 1994 and 1995 sentences for possession of marijuana because they form part of the instant offense of conspiracy to distribute drugs and are not separate, unrelated prior sentences. In his second claim, Mr. Torres contends that the court improperly assessed one criminal history point against him for the thirty-day sentence he served in 1992. He argues that if the court had properly interpreted the applicable guideline sections, it would have used the date of his "original sentence" for the juvenile offense in 1985 as instructed in § 4A1.2(k)(2)(B)(iii) instead of the "date of [his] last release from confinement," as instructed in § 4A1.2(k)(2)(B)(ii), and thus would have decided that the prior sentence was beyond the five-year limitation for including the prior sentence in assessing his criminal history.

■ We first address Mr. Torres' claim of error with regard to the district court's assignment of three criminal history points for his 1994 and 1995 misdemeanor and felony marijuana possession sentences. A challenge to the district court's determination of whether the two prior offenses were part of the instant offense is a factual determination which we review for clear error. *See United States v. Hopson,* 18 F.3d 465, 467 (7th Cir.1994) (reviewing for clear error the issue of whether district court correctly determined that prior state misdemeanor drug possession conviction was not related to present conspiracy charge); *United States v. Beddow,* 957 F.2d 1330, 1338 (6th Cir.1992) (stating that the determination of whether a prior sentence and present offense are distinct or severable is necessarily a fact-specific inquiry reviewed for clear error). We review de novo the application of the Sentencing Guidelines. *See United States v. Farnsworth,* 92 F.3d 1001, 1007 (10th Cir. 1996).

Under the Sentencing Guidelines, criminal history points are given for each "prior sentence," which is defined as "any sentence previously imposed upon adjudication of guilt ... for conduct not part of the instant offense." U.S.S.G. § 4A1.2(a)(1). The commentary accompanying § 4A1.2 provides that "[c]onduct that is part of the instant offense means conduct that is relevant conduct to the instant offense under the provisions of § 1B1.3 (Relevant Conduct)." *Id.* § 4A1.2, comment. (n.1). Thus, a prior sentence counts as criminal history if it does *not* involve relevant conduct under § 1B1.3. In cases of jointly undertaken criminal activity such as the conspiracy charged in this instance, "relevant conduct" is defined to include both "acts and omissions committed ... by the defendant ... and ... all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of ... [and] in preparation for" the offense of conviction. *Id.* § 1B1.3(a).

■ Courts have taken different approaches in determining whether a prior sentence constitutes relevant conduct for purposes of calculating criminal history. One approach asks whether the prior sentence was actually taken into account by the sentencing court in determining the total offense level. *See, e.g., United States v. Crosson,* 166 F.3d 1210 (4th Cir.1998) (Table) (holding that trial court did not err in assigning a criminal history point for the prior sentence because it properly determined that the prior sentence "was not accounted for in computing [defendant's] offense level for the instant offense"); *United States v. Oser,* 107 F.3d 1080, 1086, 1088 (3d Cir.) (holding that because district court did not take prior offense into account in determining defendant's base offense level for instant offense, prior sentence was not relevant conduct under criminal history assessment), *cert. denied,* —— U.S. ——, 118 S.Ct. 206, 139 L.Ed.2d 142 (1997). In a similar vein, this court held that a district court did not commit plain error in counting a prior conviction as criminal history when the court did not include the conviction as relevant conduct in its calculation of the offense level. *See United States v. Williamson,* 53 F.3d 1500, 1526 (10th Cir. 1995) (relying on fact that only mention of the conviction was in criminal history section of the presentence report). Except in cases such as *Williamson,* which limit review to a plain error analysis, we find this approach to be flawed because it does not allow the appellate court to review the correctness of the underlying determination that the prior offense was not relevant conduct.

Other courts have approached this criminal history determination differently. These courts have simply analyzed whether the prior sentence constituted relevant conduct without inquiring whether the sentencing court took the sentence into account in determining the total offense level. In other words, these courts make an independent evaluation of whether the prior sentence constituted relevant conduct

based on factors such as the similarity, temporal proximity, and regularity of the indicted offense and the prior offense. *See, e.g., United States v. Walling*, 936 F.2d 469, 471 (10th Cir.1991) (reviewing district court's finding that prior conviction was not part of the instant offense by comparing prior and instant offenses without reference to calculation of base offense level); *United States v. Phillips*, 129 F.3d 118 (4th Cir.1997) (Table) (reviewing and affirming district court determination that a prior conviction for distribution of crack cocaine was not relevant conduct for criminal history purposes without reference to offense level calculation).

Because this court has utilized both of these approaches, albeit under different standards of review, and because neither of the approaches seems sufficiently disciplined, standing alone, to prevent manipulation of the Sentencing Guidelines, we think that combining the two approaches provides a more appropriate analytic framework. Without explicitly so stating, this court recently utilized such a hybrid approach in *United States v. Wiseman*, 172 F.3d 1196, 1219–20 (10th Cir.1999) (affirming district court's criminal history calculation because presentence report clearly indicated that two prior convictions "were not treated as part of the instant offenses, either as 'relevant conduct' or in any other way," and because "differences in time, place, and victims made each of these robberies clearly discrete events"). In an effort to guide future cases, and to resolve this case, we follow the analysis set out in full here.

 As a threshold matter, we must first examine whether the district court took the prior sentence into account in determining the base offense level. If the district court did take the prior sentence into account in calculating the offense level, then it is clear that to prevent double counting the court cannot use that same sentence in its criminal history calculation. *See* U.S.S.G. § 4A1.2(a)(1) & comment. (n.1). However, in a case like this one, where the record shows that the court did not take the prior sentence into account for its base offense level calculation but instead used it for criminal history purposes, a second step of analysis is necessary. We also must review the court's underlying finding that the prior sentence was not part of the instant offense, i.e., that it was not relevant conduct. *See Walling*, 936 F.2d at 471. A correct determination of whether the prior sentence constituted relevant conduct is an essential predicate to the criminal history assessment. *See* U.S.S.G. § 4A1.2, comment. (n.1).

To determine whether a prior offense is conduct related to the instant offense, courts generally examine several factors, including the similarity, temporal proximity, and regularity of the instant offense and the prior sentence. *See, e.g., Walling*, 936 F.2d at 471 (examining temporal proximity and nature and substance of offenses and whether prior offense was consolidated with instant offense for trial or sentencing); *Hopson*, 18 F.3d at 468 (evaluating factors such as the nature of the offenses, evidence showing different amounts of cocaine used and charged in the offenses, the content of the indictment, and whether the government had intended to present evidence concerning the prior conviction).

In this case, the record does not answer whether Mr. Torres' two prior marijuana convictions were conduct relevant to the instant conspiracy offense. The government offered no evidence on this question. At the sentencing hearing, the government asserted that "this is not a situation where those [prior] drug offenses *charged* [Mr. Torres] with being involved in a conspiracy with one or more of the key conspirators of this case during the time period we have charged him with." Appellant's App. at 15 (emphasis added). However, the mere claim that Mr. Torres' two prior offenses did not involve *charges* of a *conspiracy* with the key conspirators of this case does not shed any light on whether the *underlying* "*acts and omissions* ... committed by the defendant" were relevant to the instant

charged conspiracy. U.S.S.G. § 1B1.3(a)(1)(A). In fact, several courts, including this one, have found relevant conduct under § 1B1.3(a)(1) in situations where the prior offense did not involve any conspirator other than the defendant. *See, e.g., United States v. Ruiz–Castro,* 92 F.3d 1519, 1537 (10th Cir.1996) (concluding that district court did not err in finding pre-conspiracy sales of cocaine to be relevant conduct because they involved similar amounts of cocaine, occurred at defendant's or buyer's house, and were regular sales, even though the sales were to an individual not charged in the conspiracy and did not involve any other conspirators); *United States v. Robles,* 132 F.3d 34, 1997 WL 735345, at *2 (6th Cir.1997) (Table) (holding that district court did not err in concluding that sale of drugs during seven years prior to charged conspiracy was relevant conduct because sales were regular and involved identical conduct and common accomplices but not charged conspirators); *United States v. Stilley,* 108 F.3d 1374 (4th Cir.1997) (Table) (affirming finding that prior drug transactions conducted between 1992 and 1994 were part of same course of conduct as conspiracy occurring in 1995 even though other member of conspiracy was not involved in prior transactions). *But see United States v. Brooks,* 114 F.3d 106, 107–08 (7th Cir.) (concluding that prior sentence for distribution of cocaine was not relevant to conspiracy charge and was countable for criminal history purposes because prior sale did not involve conspirators and was not temporally proximate, even though evidence showed it was same sort of conduct charged in indictment and distribution of cocaine was continuous throughout period of conspiracy), *cert. denied,* — U.S. —, 118 S.Ct. 115, 139 L.Ed.2d 67 (1997). Additionally, while the government acknowledged that the prior offenses "were done during the same time period [and that] it was the same type of criminal conduct" as the instant conspiracy, it merely made the negative assertion that "[t]here is no evidence before this court that those convictions arose out of this conspiracy." Appel-

lant's App. at 15. Finally, although the government did not so concede, the record also shows that the offenses were within the geographic area of the charged conspiracy.

For its part, the district court found that "there is no evidence from which the court could find by a preponderance of the evidence at least that these [prior] convictions arose out of th[e] conspiracy," *id.* at 19, and reasoned that "[b]oth convictions predated the date of the first overt act charged in this case," and that "[n]one of the drugs involved in these two [prior] cases was considered as relevant conduct in computing the defendant's base offense level." R., Supp. Vol. I at ¶ 156. However, we do not believe that the district court's reasoning was probative of whether Mr. Torres' two prior sentences were conduct relevant to the instant conspiracy. Although the prior offenses, both of which occurred in 1994, predate the first overt act charged in the instant conspiracy by two years, the prior offenses nonetheless occurred within the time period of the charged conspiracy, which was charged to have run from 1994 to 1997. The bare fact that the probation officer who prepared the presentence report *chose* not to treat the prior offenses as relevant conduct for calculating the criminal offense level provides no evidentiary support for the court's conclusion that those offenses were *not relevant* to the instant conspiracy. In fact, the only evidence which bears on the issue of relevant conduct, i.e., the temporal proximity, geographic scope, and similar conduct of the prior offenses and the instant conspiracy offense, points in the direction that it was *relevant conduct.*

However, because we do not think that the record answers whether Mr. Torres' two prior sentences were conduct relevant to the instant conspiracy, we are faced with a question that has not before been explicitly answered by this court, namely, who bears the burden of proving whether the conduct underlying Mr. Torres' two prior convictions was relevant to the in-

stant conspiracy offense. For purposes of assessing criminal history, does the government have to prove that the prior offenses were *not relevant* to the instant conspiracy (thereby including them in criminal history)? Or must the defendant prove that the prior offenses were *relevant* to the instant conspiracy (thereby excluding them from criminal history)? If the government has the burden of proof, then the defendant wins. If the defendant has the burden, then the government wins.

Facially, it is at least feasible to assume that the earlier marijuana possession offenses were relevant to the instant offense of conspiracy to distribute marijuana and cocaine because they (1) were within the time frame charged for the instant conspiracy; (2) were within the geographic scope of the instant conspiracy; and (3) involved the same product and activity as the instant conspiracy.[1] However, such an overlap by itself does not establish *as a matter of law* that the prior offenses and instant conspiracy were related. *Compare United States v. McClelland,* 141 F.3d 967, 973–74 (10th Cir.1998) (interpreting U.S.S.G. § 1B1.3(a)(2) "to mean that if the conduct is sufficiently similar and within the same temporal proximity, it may be considered relevant for purposes of determining the guideline range" and affirming finding that prior incidents constituted relevant conduct because conduct was sufficiently similar to and within same temporal proximity as conduct charged in conspiracy), *with Hopson,* 18 F.3d at 469 ("[W]e are not willing to conclude that two offenses are related merely because they occurred during the same time period and involved the same substance."). Otherwise, a sentencing court would never be able to count as criminal history drug convictions involving possession for personal use if such possession occurred within the time frame and geographic scope of a conspiracy to distribute the same type of drugs.

■ Nevertheless, three compelling reasons persuade us that the burden of proof

is on the government. First, it is generally "the government which [has] the burden of showing whatever facts are needed to justify adding additional criminal history points." *United States v. Nicholas,* 133 F.3d 133, 136 (1st Cir.1998) (quotations omitted); *cf. United States v. Hill,* 53 F.3d 1151, 1153 (10th Cir.1995) (en banc) ("The government must prove a sentence enhancement by the preponderance of the evidence."); *United States v. Kirk,* 894 F.2d 1162, 1164 (10th Cir.1990) ("The government shall bear the burden of proof for sentence increases and the defendant shall bear the burden of proof for sentence decreases."). While we are unaware of any case that explicitly assigns the burden of proving the issue of relevant conduct for criminal history purposes, *Hopson* implicitly places the burden, at least initially, on the government. In *Hopson,* the Seventh Circuit noted the defendant's argument that, "because the government did not establish by a preponderance of the evidence that his prior misdemeanor conviction was unrelated to the conspiracy charge, the district court violated his due process rights in assigning the extra guideline point" for a prior cocaine possession offense which occurred within the time frame of his conspiracy to distribute cocaine. *Hopson,* 18 F.3d at 467. In apparent agreement with the defendant, the Seventh Circuit then immediately stated that, "[u]nder the Sentencing Guidelines, due process is satisfied when information relied upon during sentencing is proven by the preponderance of the evidence." *Id.* After discussing the evidence presented by the government, the court then observed that the defendant could have rebutted the government's position "once the government presented its view of the evidence," and it rejected the defendant's claim because he failed to rebut the evidence presented by the government. *Id.* at 469. Thus, although *Hopson* does not expressly state that the government has the burden of proving that prior convictions are not relevant for criminal history purposes, its analysis assumed such a framework. *But*

1. Indeed, this was the position Mr. Torres took at sentencing.

*see United States v. Randolph,* 64 F.3d 670 (10th Cir.1995) (Table) (implicitly placing burden on defendant to present evidence showing prior offenses were relevant conduct for purposes of assessing criminal history).

■ Second, prior convictions count as criminal history only if their underlying conduct was not relevant to the instant offense under U.S.S.G. § 1B1.3. *See* U.S.S.G. § 4A1.2, comment. (n.1). The government has always shouldered the burden of proving relevant conduct asserted to increase a defendant's *base offense level. See United States v. Richards,* 27 F.3d 465, 468 (10th Cir.1994). This allocation of the burden of proof persuades us to require the government to disprove the relevancy of prior conduct asserted to increase a defendant's *criminal history score.* Although in the latter case the required proof is that conduct is *not* relevant, in both scenarios the government seeks to use the *issue* of relevant conduct, through the use of uncharged conduct, to expose a defendant to higher sentences under the Guidelines. *See United States v. Matthews,* 942 F.2d 779, 784 (10th Cir. 1991) ("The government bears the burden of proving uncharged conduct by a preponderance of the evidence."). Placing the burden of proof on the government in both scenarios imposes some discipline on how the government determines that a defendant's prior offense should be counted under the Guidelines, thus preventing arbitrary and inconsistent manipulation of the Guidelines to obtain a higher sentence.

Third, as a matter of policy, it seems that the government is at least as well-positioned to come forward with the required proof as the defendant. After all, the government chooses the scope of the conspiracy with which to charge the defendant, and it should be prepared to prove what conduct is relevant to its charged conspiracy. The government can always narrow the charge of conspiracy to reduce its burden.

We recognize that there are also persuasive reasons for putting the burden of proof on the defendant. For one, the defendant is in the best position to know the scope of the actual conspiracy. For another, this court usually only requires the government to prove the *existence* of a prior conviction by a preponderance of the evidence in order for it to be considered a prior conviction for purposes of calculating criminal history. *See United States v. Simpson,* 94 F.3d 1373, 1381 (10th Cir. 1996) ("The government must establish the fact of a prior conviction by a preponderance of the evidence."). The defendant then has the burden of proving, by a preponderance of the evidence, that the prior conviction should not be used to calculate criminal history because it was constitutionally infirm. *See United States v. Windle,* 74 F.3d 997, 1001 (10th Cir.1996).

Ultimately, however, the reasons for putting the burden on the defendant are not compelling. First, although the defendant would have better knowledge of the scope of the *actual* conspiracy, the government has control over the scope of the *charged* conspiracy and should know what it encompasses. Second, the situation where the defendant has to prove the constitutional infirmity of his prior conviction to avoid having it counted as criminal history is dissimilar to the instant case. There, the defendant is in the better position of proof because he was present during the prior conviction and should know what constitutional infirmities to assert. Placing the burden on the government in that context would saddle it with an open-ended obligation with no clear target. Here, in contrast, the government can determine from the prior court records exactly what conduct was involved in those earlier convictions, and the government has complete power to define the scope of the conspiracy with which to charge the defendant. It therefore is reasonable to impose upon the government the burden of proving that the conspiracy it chooses to charge does *not relate* to conduct underlying prior convictions which the government seeks to include in the defendant's criminal history.

In summary, at least where the scope of the charged conspiracy covers (1) a time frame, (2) a geographic area, and (3) a subject matter or purpose broad enough to include prior convictions, we hold that the government bears the burden of proving by a preponderance of the evidence that the prior convictions were not relevant conduct and hence not part of the charged conspiracy. Only then can the government utilize those prior convictions to increase the defendant's criminal history score.

Because the government has failed to meet that burden here, the district court erroneously found that Mr. Torres' two prior convictions were not part of the instant offense. We accordingly reverse and remand for resentencing with instructions to the district court to reduce Mr. Torres' criminal history points to six, which places him in criminal history category III. We point out that this result does not mean that the prior sentences are *a fortiori* relevant conduct; we conclude simply that the government failed in its burden of proof. However, our reversal and remand for resentencing does not invite an open season for the government to make the record that it failed to make in the first instance.

In his second issue raised on appeal, Mr. Torres challenges the court's one-point assessment for his thirty-day sentence in 1992. In support of his argument, Mr. Torres urges us to read §§ 4A1.1, 4A1.2(d) and 4A1.2(k)(2)(B) in concert and imply from their terms an interrelationship between § 4A1.2(k)(2)(B) subsections (ii) and (iii) and the referenced sections of § 4A1.2(d). Mr. Torres argues that § 4A1.2(k)(2)(B)(ii)—the guideline relied upon by the court—does not apply to his thirty-day sentence from 1992 because it specifically references § 4A1.2(d)(2)(A), which limits the assessment of criminal history points to an "adult or juvenile sentence to confinement of at least sixty days." U.S.S.G. § 4A1.2(d)(2)(A). Mr. Torres reasons that because § 4A1.2(k)(2)(B)(ii) is so related to § 4A1.2(d)(2)(A), it must not apply to his thirty-day sentence, and the court should have used the date of his original juvenile sentence in 1985 as instructed in § 4A1.2(k)(2)(B)(iii) for the purpose of deciding whether to assess criminal history points for the juvenile offense. Applying this interpretation, Mr. Torres contends that his original 1985 conviction does not fall within five years of the "commencement of the instant offense," *id.* § 4A1.2(d)(2)(A), and consequently the district court inappropriately counted the conviction as part of his criminal history score. *See id.* § 4A1.2(e)(3) ("Any prior sentence not within the time periods specified . . . is not counted.").

Mr. Torres' argument raises valid Guideline application questions. Nevertheless, because we have concluded that the court incorrectly included three criminal history points for Mr. Torres' prior sentences for marijuana possession and because we remand for resentencing applying criminal history category III, we find it unnecessary to address this claim. Assuming that Mr. Torres prevailed on this second issue, the resulting one-point deduction from his criminal history would do nothing to change his criminal history category III status. *See id.* at Ch. 5. Pt. A. Because a decision on this issue would have absolutely no impact on Mr. Torres' sentence, we leave the resolution of the question for another day.[2]

REVERSED and REMANDED.

---

2. Apparently, this court has never addressed this second issue raised by Mr. Torres. Even so, the lack of Tenth Circuit authority on the subject is no reason to abandon principles of judicial restraint and render an opinion that is unnecessary and meaningless as applied to the defendant in this case. Consequently, we reserve judgment on the matter until such time as a decision will actually affect a defendant's sentence. Perhaps in the meantime, the Sentencing Commission will see fit to

UNITED STATES of America,
Plaintiff–Appellee/Cross–
Appellant,

v.

Eleuterio GARCIA, Defendant–
Appellant/Cross–Appellee.

Nos. 98–2012, 98–2031.

United States Court of Appeals,
Tenth Circuit.

July 7, 1999.

further clarify the Guidelines as they pertain to this issue.

John L. Sullivan, Rothstein, Donatelli, Hughes, Dahlstrom, Cron & Schoenburg, LLP, Santa Fe, New Mexico (Mark H. Donatelli, Rothstein, Donatelli, Hughes, Dahlstrom, Cron & Schoenburg, LLP, Santa Fe, New Mexico and Michael W. Lilley of Las Cruces, New Mexico, with him on the briefs), for Defendant–Appellant/Cross–Appellee.

Richard A. Friedman, Attorney, Appellate Section of Criminal Division of the Department of Justice, Washington, D.C. (John J. Kelly, United States Attorney for the District of New Mexico and Mick I.R. Gutierrez, Assistant United States Attorney for the District of New Mexico with

him on the brief) for Plaintiff–Appellee/Cross–Appellant.

Before **PORFILIO, BALDOCK** and **EBEL**, Circuit Judges.

EBEL, Circuit Judge.

This appeal involves the defendant's challenge to the district court's denial of a motion for judgment of acquittal based on an entrapment defense and denial of motions for a new trial, as well as the government's cross-appeals on several sentencing issues. We affirm the district court's judgment, except for the district court's two-level reduction based on the minor participant provision of the Sentencing Guidelines, on which we reverse and remand.

On December 14, 1995, Defendant–Appellant/Cross–Appellee Eleuterio Garcia was arrested for trafficking cocaine, and was later charged with possession of cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), and 18 U.S.C. § 2. At trial, his sole defense was that paid government informant Saul Horcasitas entrapped him. The jury returned a guilty verdict, and Garcia's post-trial motions for judgment of acquittal and for a new trial were denied.

At sentencing, the district court adjusted downward Garcia's base offense level by six levels, pursuant to the safety valve, acceptance of responsibility, and minor participant provisions of the Sentencing Guidelines. The district court then departed downward an additional seven levels, finding Garcia's commission of the crime to be a single act of aberrant behavior. In total, Garcia's offense level dropped from twenty-eight to fifteen, which, when combined with his criminal history category of I, established a guideline imprisonment range of eighteen to twenty-four months. Garcia was sentenced to eighteen months in prison. The government cross-appeals the downward departure, as well as the acceptance of responsibility and minor participant adjustments.

## I. *Entrapment as a Matter of Law*

█ Garcia argues that he was entrapped as a matter of law, and that the district court thereby erred in denying his motion for judgment of acquittal. The denial of a motion for judgment of acquittal based on entrapment is reviewed de novo, viewing all the evidence and drawing all reasonable inferences in the light most favorable to the government. *See United States v. Lampley*, 127 F.3d 1231, 1242 (10th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1098, 140 L.Ed.2d 153 (1998).

█ "Entrapment exists as a matter of law only if the evidence of entrapment is uncontradicted. When a jury has found that no entrapment existed, we can alter that finding on legal grounds only 'where the holding should be made without choosing between conflicting witnesses nor judging credibility.... Accordingly, we review only whether sufficient evidence exists to support the jury's verdict.'" *United States v. Martinez*, 979 F.2d 1424, 1429 (10th Cir.1992) (quoting *United States v. Dozal–Bencomo*, 952 F.2d 1246, 1250 (10th Cir.1991)) (citations omitted). Once the defense of entrapment is properly raised, the government has the burden of proving that the defendant was predisposed to commit the crime. *United States v. Duran*, 133 F.3d 1324, 1327 n. 2 (10th Cir. 1998). The "entrapment defense has two parts: (1) the lawfulness of the government's conduct, and (2) the defendant's predisposition to engage in the criminal activity." *Lampley*, 127 F.3d at 1242. Garcia's claim of entrapment as a matter of law focuses on the second element, predisposition. Garcia contends that the government failed in its burden to prove that he was predisposed to commit a criminal act prior to being approached by the government. "Predisposition to commit a criminal act may be shown by evidence of similar prior illegal acts or it may be inferred from defendant's desire for profit, his eagerness to participate in the transaction, his ready response to the government's inducement offer, or his demon-

strated knowledge or experience in the criminal activity." *Duran,* 133 F.3d at 1335 (internal quotations and citations omitted). As a result, although *Jacobson v. United States,* 503 U.S. 540, 549, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992), requires that the defendant's predisposition be viewed at the time the government agent first approached the defendant, inferences about that predisposition may be drawn from events occurring after the two parties came into contact. *See Duran,* 133 F.3d at 1336 (finding sufficient evidence of predisposition where defendant, *inter alia,* "bragged" to the government informant "about being able to obtain drugs"); *United States v. Mendoza–Salgado,* 964 F.2d 993, 1003 (10th Cir.1992) ("[Defendant's] solicitous telephone discussions with [the government agent] regarding defendant's ability to supply cocaine, his express interest in handling future drug purchases and his attendance at the preliminary meeting between [his supplier] and agents exemplifies a profound eagerness to engage in the illegal activity.").

We find there is sufficient evidence to prove that Garcia was predisposed to distribute narcotics. The government's paid informant, Saul Horcasitas, testified that three weeks after he moved into the trailer next door to Garcia, it was Garcia who first suggested to Horcasitas that he should sell cocaine. Additionally, Garcia's vocabulary and manner of dealing with Horcasitas demonstrates knowledge and experience in illicit drug trades. During two taped telephone conversations between Garcia and Horcasitas, Garcia demonstrated knowledge of the drug trade when he understood Horcasitas' use of code words. Horcasitas talked to Garcia in code, using phrases like "animals" (cocaine), "bundles" (kilograms), and "papers" (money), and Garcia had no problem understanding Horcasitas' lingo. In fact, Garcia even used code words, stating in one conversation that he wanted to look "at the papers to see if I like them, to see if they work on the roof." Police Officer Mike Mulliniks testified that such code is used by people "familiar with dealing in drugs," and it is not unreasonable for a jury to find that someone who understands such code is predisposed to deal drugs. *See Mendoza–Salgado,* 964 F.2d at 1003 ("'code words' to describe drugs and related matter further exemplifies ... understanding of the narcotics trade").

Other evidence admitted at trial sufficiently establishes Garcia's predisposition. DEA Agent James Baker testified that the amount of cocaine involved in the transaction, 2.987 kilograms, is "consistent with more sophisticated operators." Moreover, Garcia had a conversation with Horcasitas in which Garcia refused to transport the cocaine from Las Cruces, New Mexico to Hatch, New Mexico. Garcia's refusal to transport the cocaine to Hatch from Las Cruces reasonably could be interpreted as evincing a sophisticated understanding of the risks of transporting drugs, because Border Patrol checkpoints are positioned between the two cities. Garcia also knew to ensure his security by insisting that the drug deal occur on his home turf; that the transaction be completed quickly at the time Garcia, not the buyers, demanded; and that the locations for the drug deal frequently change. Finally, Garcia was apparently experienced enough to maintain a cool, calm, and collected businesslike demeanor throughout the entire drug transaction.

Given this evidence, and all reasonable inferences which can be drawn in the government's favor, the district court did not abuse its discretion in denying the motion for judgment of acquittal. A jury reasonably could find that the nearly three kilogram cocaine deal involving Garcia resembled a sophisticated drug transaction that someone predisposed to drug trafficking would commit.

## II. *Motion for a New Trial*

Garcia filed a motion for a new trial on the ground that the verdict was against the weight of the evidence with regard to his sole defense of entrapment. The district court denied the motion, and

Garcia appeals, arguing that the district court totally failed to weigh any evidence. A district court's denial of a new trial based on the weight of the evidence is reviewed for abuse of discretion. *United States v. Evans,* 42 F.3d 586, 593 (10th Cir.1994). Though the district court's reasoning could have been more explicit, the district court did not abuse its discretion.

■ A motion for new trial should be granted if, "after weighing the evidence and the credibility of the witnesses, the court determines that 'the verdict is contrary to the weight of the evidence such that a miscarriage of justice may have occurred.'" *United States v. Gabaldon,* 91 F.3d 91, 93–94 (10th Cir.1996) (quoting *Evans,* 42 F.3d at 593). In its Memorandum Opinion and Order denying the motion, the district court stated that it "considered the briefs, testimony of witnesses and [was] otherwise fully informed," and it then concluded that the motion for new trial was "not well taken." The court laid out in detail the testimony of Horcasitas, Agent Baker, and Officer Mulliniks, and ultimately found this testimony to be "directly relevant to the question of inducement and contradictory to Mr. Garcia's testimony." The court concluded that "[b]ecause of this conflict the Court cannot say that Mr. Garcia was entrapped as a matter of law." Although its reasoning was not explicit, we believe the district court weighed the evidence and considered the credibility of all the witnesses. The court's complete description of the evidence pertaining to the entrapment defense, its express consideration of "the briefs, testimony of witnesses and being otherwise fully informed," combined with the court's explicit rejection of the new trial motion establish that the court weighed the evidence, and found it not to support a motion for new trial. Accordingly, Garcia's appeal on this matter fails.

### III. *Failure to Hold Hearing Regarding Potential Jury Misconduct*

■ Garcia also asserts that the district court erred in failing to conduct a hearing regarding potential jury misconduct. The denial of a motion for new trial based on juror misconduct is reviewed under the abuse of discretion standard. *See United States v. Davis,* 60 F.3d 1479, 1482 (10th Cir.1995).

Garcia alleges that several jurors saw him arrive at the courthouse in a recent model pickup truck and that they improperly inferred that to afford such an expensive vehicle, he must have been a drug dealer. Garcia argues that the jurors' observations of him arriving at the courthouse in a luxurious automobile constitutes external information triggering a presumption of prejudice under *Remmer v. United States,* 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954).

*Remmer* dealt with a third party offer of a bribe to the jury foreman in exchange for a favorable verdict. The Supreme Court held that the trial court erred in not conducting a hearing with the participation of the defendant to determine the effect of the offered bribe on the jury, and stated: "In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial." *Id.* at 229, 74 S.Ct. 450. *Remmer*'s presumption of prejudice does not apply to Garcia because the jurors' alleged observations of Garcia and his pickup truck do not constitute direct or indirect private "communication, contact, or tampering." Seeing Garcia arrive at court in his truck is not extraneous evidence, in the same way that it is not extraneous evidence when a juror observes the defendant walking down the corridor of the courthouse between trial dates, or sees the defendant at the grocery store. "To hold otherwise would require a *Remmer* hearing based on each of the multiple ordinary incidental contacts between non-sequestered jurors and virtually any other person during the course of a trial." *United States v. Brooks,* 161 F.3d 1240, 1246 (10th Cir.1998) (holding *Remmer* inapplicable where juror spoke with security officers during lunch break on first day of trial, without evidence that their conversa-

tions were "about the matter pending before the jury"). *Remmer* and its applications in this Circuit thus foreclose us from adopting Garcia's arguments. We further observe that, in any event, photographs were introduced in evidence showing Garcia in this truck. The *Remmer* presumption is not applicable and the district court acted within its discretion in refusing to hold a hearing on the matter.

## IV. *The Government's Cross–Appeals from the Sentence*

The government raises three issues on cross-appeal. The government contends that the district court erred in adjusting Garcia's sentence downward based on his acceptance of responsibility and minor participant status in the offense. The government also argues that the district court erred in granting a downward departure for aberrational behavior. We hold that the district court erred only in its minor participant downward adjustment; therefore, we affirm in part and reverse in part.

### A. *Acceptance of responsibility*

■■■■■■■ At sentencing, the district court granted Garcia a two point reduction for acceptance of responsibility. The court made a factual finding that:

The defendant meets the criteria of Section 3E1.1(a) and will receive a two (2) level reduction for acceptance of responsibility.... The defendant admitted his involvement in the offense since his initial arrest and throughout the trial. Further, the defendant has given the Government all the information he knows about the offense. The Court finds it was appropriate for the defendant having presented an entrapment defense which admitted the underlying facts, to receive full credit for acceptance of responsibility.

On cross-appeal, the government argues that the district court erred as a matter of law in applying the acceptance-of-responsibility credit under U.S.S.G. § 3E1.1 because Garcia went to trial, asserted an entrapment defense, and thereby, according to the government, refused to acknowledge that he willfully engaged in drug trafficking. The issue before us is whether asserting an entrapment defense at trial bars receipt of an acceptance-of-responsibility reduction as a matter of law. The circuits appear split on this matter,[1] al-

1. The Third, Sixth, Ninth, and Eleventh Circuits have concluded that the entrapment defense and the acceptance of responsibility reduction are not necessarily incompatible. *See United States v. Demes*, 941 F.2d 220, 222 (3d Cir.1991) ("[I]t is conceivable to hypothesize a case in which a plea of entrapment would not be inconsistent with the acceptance of responsibility...."); *United States v. Fleener*, 900 F.2d 914, 918 (6th Cir.1990) ("[W]e find that the district court did not err in considering a reduction for acceptance of responsibility even though [the defendant] raised an entrapment defense at trial. Such a defense is no less inconsistent with the Guidelines provision than is a plea of not guilty, which does not raise an absolute bar to a court's consideration."); *United States v. Ing*, 70 F.3d 553, 556 (9th Cir.1995) ("The assertion of an entrapment defense is not necessarily incompatible with acceptance of responsibility."); *United States v. Davis*, 36 F.3d 1424, 1435 (9th Cir.1994) ("[T]he district court could not have found that [the defendant] had not accepted responsibility solely because he presented an entrapment defense at trial.");

*Joiner v. United States*, 103 F.3d 961, 963 (11th Cir.) ("[The defendant] would not have been barred as a matter of law from receiving an adjustment merely because he asserted an entrapment defense at trial, even though some courts have viewed the assertion of an entrapment defense as the virtual antithesis of acceptance of responsibility. Rather, as with cases involving any other defense, whether a defendant has accepted responsibility is a fact-based question which requires the district court to carefully review all of the evidence bearing on a particular defendant's contrition.") (citation omitted), *cert. denied*, 520 U.S. 1246, 117 S.Ct. 1857, 137 L.Ed.2d 1058 (1997). The First Circuit seems to have reached the same conclusion. *See United States v. Ellis*, 168 F.3d 558, 564 (1st Cir. 1999) ("In some cases, defenses relating to intent may yet qualify for the acceptance of responsibility reduction.") (citing *Fleener,* 900 F.2d at 918).

On the other hand, the Fifth and Eighth Circuits have held that an entrapment defense and a § 3E1.1 reduction are necessarily incompatible. *See United States v. Brace*, 145

though only the Sixth Circuit has addressed the issue in a case with the same posture as here: an appeal from a sentencing court's *grant* of the reduction. *See United States v. Fleener,* 900 F.2d 914 (6th Cir.1990) (affirming the district court's decision to grant a two-point reduction for acceptance of responsibility because of the defendant's pretrial cooperation with the government on the merits of the offense, notwithstanding the defendant's assertion at trial of an entrapment defense). Like the Sixth Circuit, we hold that a § 3E1.1 reduction is not per se unavailable just because the defendant chooses to go to trial solely on an entrapment defense.

The entrapment defense is founded upon the rule of statutory construction that prohibits literal interpretation of a statute that produces absurd results. In *Sorrells v. United States,* 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932), where the Supreme Court first recognized the entrapment defense, the government's argument against recognition of the entrapment defense was tied to the "letter of the statute" under which the defendant was prosecuted. *Id.* at 446, 53 S.Ct. 210. The Supreme Court, however, rejected a literal reading of the criminal statute, and explained:

> Literal interpretation of statutes at the expense of the reason of the law and producing absurd consequences or flagrant injustice has frequently been condemned. . . .

> . . . . .

> We think that this established principle of construction is applicable here. We are unable to conclude that it was the intention of the Congress in enacting this statute that its processes of detection and enforcement should be abused by the instigation by government officials of an act on the part of persons otherwise innocent in order to lure them to its commission and to punish them.

F.3d 247, 265 (5th Cir.) (en banc) ("[A]n entrapment defense is a challenge to criminal intent and thus to culpability. Accordingly, this is not one of those 'rare situations', contemplated by the guideline commentary, in which a defendant may proceed to trial and still satisfy § 3E1.1(a)."), *cert denied,* — U.S. —, 119 S.Ct. 426, 142 L.Ed.2d 347 (1998); *United States v. Chevre,* 146 F.3d 622, 625 (8th Cir.1998) ("We believe that '[w]here a defendant persists in asserting entrapment, she cannot also claim acceptance of responsibility.' ") (quoting *United States v. Simpson,* 995 F.2d 109, 112 (7th Cir.1993)).

The D.C. Circuit comes very close to holding that the entrapment defense is incompatible with acceptance of responsibility, but it has left the door just slightly ajar on that issue. *See United States v. Kirkland,* 104 F.3d 1403, 1406 (D.C.Cir.) ("It may be that a situation could be presented in which an entrapment defense is not logically inconsistent with a finding of a defendant's acceptance of responsibility, even though we doubt it (that three of our sister circuits seem to think so is sufficient reason to be somewhat cautious), but certainly defense counsel's argument before the district court did not raise it."), *cert. denied,* 520 U.S. 1246, 117 S.Ct. 1857, 137 L.Ed.2d 1059 (1997).

The Seventh Circuit appears to be split internally. *Compare United States v. Corral–Ibarra,* 25 F.3d 430, 440 (7th Cir.1994) (finding that an entrapment defense if pleaded in good faith "may possibly qualify" for a § 3E1.1 reduction, but in such a case "a determination that a defendant has accepted responsibility will be based *primarily* upon *pre-trial* statements and conduct"), *with United States v. Rector,* 111 F.3d 503, 508 (7th Cir.1997) ("[T]he adjustment [for acceptance of responsibility] is rarely available to those who assert entrapment, a defense that by its nature tends to preclude the acceptance of responsibility. Essentially, the problem is that asserting entrapment is a denial rather than an acceptance of responsibility. A defendant asserting such a defense is saying, in effect, 'I did it but it was somebody else's fault that I did it.' That is the antithesis of remorse or acceptance of responsibility."), *overruled on other grounds by United States v. Wilson,* 169 F.3d 418, 428 n. 9 (7th Cir.1999), *cert. denied,* 119 S.Ct. 2383 (U.S. 1999), *and United States v. Simpson,* 995 F.2d 109, 112 (7th Cir.1993) ("Where a defendant persists in asserting entrapment, she cannot also claim acceptance of responsibility."), *and United States v. Emenogha,* 1 F.3d 473, 482 (7th Cir.1993) (same).

The Second Circuit has noted, but has yet to address the issue. *See United States v. Rosa,* 17 F.3d 1531, 1552 (2d Cir.1994) (expressly refusing to determine "whether a defendant who claims 'sentencing entrapment' may ever receive the two-point reduction").

We are not forced by the letter to do violence to the spirit and purpose of the statute.

*Id.* at 446–48, 53 S.Ct. 210. Thus, the entrapment defense is a creature of statutory construction that concedes that the defendant's conduct satisfies the essential factual elements of guilt, but nonetheless refuses to apply the statute to an entrapped defendant to avoid creating an absurd result. *See also Jacobson,* 503 U.S. at 553, 112 S.Ct. 1535 (reaffirming quoted passage from *Sorrells* ); *Sherman v. United States,* 356 U.S. 369, 372, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958) ("Congress could not have intended that its statutes were to be enforced by tempting innocent persons into violations."); *United States v. Russell,* 411 U.S. 423, 428, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973) ("[In *Sorrells,*] Mr. Chief Justice Hughes, speaking for the Court, held that as a matter of statutory construction the defense of entrapment should have been available to the defendant."); *id.* at 433–34, 93 S.Ct. 1637 ("Critics of the rule laid down in *Sorrells* and *Sherman* have suggested that its basis in the implied intent of Congress is largely fictitious.... Arguments such as these, while not devoid of appeal, have been twice previously made to this Court, and twice rejected by it, first in *Sorrells* and then in *Sherman.*"); Ronald J. Allen et al., Constitutional Criminal Procedure 980 (3d ed. 1995) ("[T]he Court has consistently reaffirmed that the key to the federal entrapment defense is the absence of predisposition on the part of the defendant and that the defense exists as a matter of statutory construction.").

Given that the entrapment defense emanates from such a rule of statutory construction, we believe that a sentencing court may apply an acceptance-of-responsibility reduction to a defendant who asserts the entrapment defense. The commentary to § 3E1.1 states that conviction by trial "does not automatically preclude a defendant from consideration for such a reduction." U.S.S.G. § 3E1.1, cmt. (n.2).

In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (*e.g.,* to make a constitutional challenge to a statute or *a challenge to the applicability of a statute to his conduct* ). In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.

*Id.* (emphasis added). As the long line of Supreme Court entrapment cases show, the entrapment defense is just such a "challenge to the applicability of a statute" to the defendant's conduct. The defendant, when defending at trial based only on the entrapment defense, is essentially saying: "I am factually guilty, but it was the government that induced commission of the crime and planted the criminal intent. I thereby was entrapped. Therefore, Congress did not intend for this criminal statute to apply to my conduct." Thus, the entrapment defense is one of those "rare situations" contemplated by the Sentencing Guidelines in which a defendant may go to trial and still receive an acceptance of responsibility reduction.

We are mindful of this court's prior statement in *United States v. Hansen,* 964 F.2d 1017, 1021 (10th Cir.1992), that it is "difficult for this Court to envision how the defendant argues that he affirmatively accepted responsibility for his criminal action when throughout the proceedings he maintained that his criminal action was not his fault, but rather, it was the result of government inducement." Nothing we say today is inconsistent with this statement. We hold only that raising the entrapment defense does not *necessarily* foreclose the possibility of receiving a reduction for acceptance of responsibility, but that does not mean that the simple assertion of the entrapment defense coupled with acknowledgment of the underlying criminal activity automatically entitles a defendant to a two-point acceptance of responsibility reduction. *See also United States v. Hoen-*

*scheidt*, 7 F.3d 1528, 1532 (10th Cir.1993) (no error where sentencing court acknowledged the entrapment defense "does not necessarily bar" a § 3E1.1 reduction); *United States v. Wallace*, 133 F.3d 933 (10th Cir. 1998) (unpublished) ("[I]t is possible that a failed entrapment defense could coexist with an acceptance of responsibility adjustment."), *cert. denied,* —— U.S. ——, 118 S.Ct. 1855, 140 L.Ed.2d 1103 (1998); *United States v. Ortegon–Antillon*, 65 F.3d 179 (10th Cir. 1995) (unpublished) ("A defendant who forces the government to prove its case at trial will only rarely warrant a reduction for acceptance of responsibility. One such rare occasion may arise when a defendant who otherwise expresses remorse, contrition, or acknowledgment of wrongdoing nonetheless pleads not guilty because of entrapment.") (citation omitted). A defendant will need to evidence acceptance of responsibility, primarily through pre-trial statements and conduct, before an acceptance of responsibility reduction would be warranted. *See* U.S.S.G. § 3E1.1, cmt. 2.

■■■■■ Some courts have suggested that the entrapment defense and U.S.S.G. § 3E1.1 are incompatible because the entrapment defense challenges the factual element of intent. *See United States v. Brace*, 145 F.3d 247, 265 (5th Cir.) (en banc), *cert. denied,* —— U.S. ——, 119 S.Ct. 426, 142 L.Ed.2d 347 (1998); *United States v. Kirkland*, 104 F.3d 1403, 1405 (D.C.Cir.), *cert. denied,* 520 U.S. 1246, 117 S.Ct. 1857, 137 L.Ed.2d 1059 (1997). Entrapment is indeed "intertwined" with the issue of intent, *United States v. Fadel*, 844 F.2d 1425, 1430 (10th Cir.1988), because the jury is asked to consider "whether that intent was the result of Government inducement," *Mathews v. United States*, 485 U.S. 58, 65, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988). However, asking whether the defendant's intent was the result of government inducement does not challenge the

factual element of intent. As the Supreme Court has clearly stated, "[entrapment] is rooted ... in the notion that Congress could not have intended criminal punishment for a defendant who has committed *all the elements of a proscribed offense,* but was induced to commit them by the Government." *United States v. Russell*, 411 U.S. 423, 435, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973) (emphasis added); *see also,* Ronald J. Allen et al., Constitutional Criminal Procedure 999 (3d ed. 1995) ("Typically defendants claiming entrapment do not challenge the prosecutor's proof of the elements of the offense."). In this case, Garcia was charged with possession of cocaine with intent to distribute. "To support a conviction of possession with intent to distribute, the evidence must prove beyond a reasonable doubt the following elements: (1) the defendant knowingly possessed the illegal drug; and (2) the defendant possessed the drug with the specific intent to distribute it." *United States v. Carter*, 130 F.3d 1432, 1440 (10th Cir.1997) (internal quotations omitted), *cert. denied,* —— U.S. ——, 118 S.Ct. 1856, 140 L.Ed.2d 1104 (1998). The entrapment defense challenges neither of these elements. Garcia admits that he knowingly possessed cocaine and that he specifically intended to distribute the cocaine. Instead, Garcia asserted the entrapment defense, which functions as an "origin-of-intent" defense, conceding that he had the requisite criminal intent when the crime was committed, but claiming that the requisite criminal intent was planted by the government. If it is proven that the government "originate[d] a criminal design, implant[ed] in an innocent person's mind the disposition to commit a criminal act, and then induce[d] commission of the crime," *Jacobson*, 503 U.S. at 548, 112 S.Ct. 1535, then pursuant to a rule of statutory construction, the criminal statute does not apply to the defendant, and he or she should therefore not be punished.[2]

---

Even if the entrapment defense were viewed as challenging the factual element of intent, under the law of this circuit, we would still affirm the district court's acceptance-of-responsibility downward adjustment. In *United States v. Gauvin*, 173 F.3d 798 (10th Cir.1999), the defendant was charged with assault with a dangerous weapon and assault on a federal officer. The defendant "went to trial only to contest the legal element of intent. . . . [The defendant] disputed whether his acknowledged factual state of mind met the legal criteria of intent to harm or cause apprehension." *Id.* at 806. He argued at trial, to no avail, that "he did not intend, while drunk and scared, to cause injury to others. [He also] contended that his drunkenness rendered him incapable of forming the requisite mens rea." *Id.* The defendant was convicted, but the district court granted him a § 3E1.1 reduction. We affirmed, reasoning that the defendant's "defense—essentially a challenge to the applicability of the statute to his conduct, *see* U.S.S.G. § 3E1.1, cmt. n. 2—does not as a matter of law preclude application of the guideline." *Id.* If an intoxication defense challenging the mens rea of a crime does not necessarily foreclose an acceptance-of-responsibility reduction, then neither does an entrapment defense. Accordingly, the district court's ruling was consistent with the law and it committed no error in granting Garcia a § 3E1.1 downward adjustment.

### B. Minor participant

 The trial court granted Garcia a two level reduction from the base offense level because he was a "minor participant." The court explained:

> [T]he defendant is viewed as a minor participant. The defendant was recruited by a paid informant who befriended the defendant and his pregnant daughter for several months with the goal to ensnare him in this illegal activity and who preyed on the defendant's sympa-

thy for the paid informant's seemingly impoverished lifestyle.